## The Bergen Savings Bank

*v.*

## James M. Barrows and others.

. 1. Where the holder of a first mortgage has received ample collateral security for its payment, the rights of a subsequent mortgagee cannot be defeated by the assignment of the first mortgage to a party who had full notice and knowledge of such other encumbrance and the equity of the holder thereof in respect to such collateral security.

2. A mortgage held by J. B., covering several lots of land, had been reduced to $7,400 at the time when the mortgagor sold an unreleased lot to M. & R., with full covenants of warranty &c., receiving therefor a mortgage. In order to obtain releases of some of the other lots, the mortgagor assigned to J. B. two other mortgages, for $6,500, and his own note for $900. Afterwards, such mortgagor assigned to F. the M. & R. mortgage, representing to F. that it was a first mortgage. To secure another debt, the mortgagor and the complainants induced J. B. to assign to the complainants the $7,400 mortgage, which was taken by them with notice and knowledge of the equity of F.—*Held*, that, as to the amount of the collaterals, $6,500, the complainant's mortgage must be held to be satisfied as against F.

Bill to foreclose. On final hearing on pleadings and proofs.

*Mr. W. Brinkerhoff*, for complainants.

*Messrs. Collins & Corbin*, for defendant Bill.

The Chancellor.

In 1865, James M. Barrows, who was then the owner of a tract of land in Jersey City, gave a mortgage upon it to secure the payment of $25,000, with interest. This mortgage was subsequently (June 10th, 1867) assigned by the mortgagee to Bartholomew Brown, in trust for Mary S. Brown. The assignee and his *cestui que trust* afterwards, from time to time, released parts of the mortgaged premises from the lien and encumbrance of the mortgage. On the

1st of November, 1871, Barrows conveyed part of the unreleased residue of the property to William T. Mount and William Russell, by deed, with the usual full covenants, including covenant against encumbrances and covenant of warranty general, taking from them mortgages for the purchase-money. At that time all the principal of the complainant's mortgage, which was then held by Brown, had been paid, except $7,400. In order to obtain releases of other parts of the premises covered by that mortgage, Barrows assigned to Brown two mortgages, one called the Sutton mortgage, for $2,500, assigned March 1st, 1872, the other called the Redman and Mabin mortgage, for $4,000, assigned January 8th, 1874, and gave him his note for $900. On the 23d of July, 1874, Barrows assigned one of the mortgages received by him from Mount and Russell to the defendant Frederick Bill, representing to him that it was the first mortgage on the property, and guaranteeing the payment thereof. That mortgage, though nominally for the sum of $7,000 and interest, was, in fact, security for only $2,000 and interest, and it was so understood between Barrows and Bill when the assignment was made. The representation that that mortgage was a first mortgage was untrue, because the complainants' mortgage, then still held by Brown, was upon the property. Barrows justifies the representation on the ground that he at that time regarded the Brown mortgage as having been practically paid by the collaterals—the mortgages and note before mentioned, which Brown then held.

In the fall of 1875, Barrows (who, from 1870 up to that time, had been president of the Bergen Savings Bank), the complainant, was requested by the board of trustees of the institution to resign. Among the reasons for this action was the fact that he had, without authority and unlawfully, invested the funds of the bank on second mortgage, and that, too, of property in which he was, or subsequently became, interested. He was embarrassed in his pecuniary affairs, and suits had been commenced against him. He

Bergen Savings Bank *v.* Barrows.

sent in his resignation, and, for the purpose of relieving himself from the difficulties of his situation in connection with the loans just referred to, he proposed that the bank should lend him $7,400 on the security of the Brown mortgage. The secretary of the bank testifies, on the subject of the proposition and agreement, as follows : " Barrows said that he was authorized to say that Brown would assign the mortgage to the bank, and accept from him $1,400 cash and the $6,000 worth of mortgages which Brown then held as collateral. I think these mortgages were, first, a mortgage for $4,000 on a house on Grand street, and, second, a second mortgage against William H. and Martha Sutton. I am satisfied, upon reflection, that these were the mortgages. Now Barrows said that if we, the bank, would pay him $7,400, he would pay the taxes and assessments on this property covered by the mortgage, being the six lots on Madison avenue, and would also pay off the $2,600 mortgage on the Clerk street house (this was one of the second mortgages taken by him for the bank), of which he was the owner; and, as he, when president of the bank, had loaned $1,600 on that mortgage, he would ask the bank to endorse the $1,000 on account of the note of Mount and Russell for $1,400, which was secured by a second mortgage of James E. Moore, on a brick house on Bramhall avenue, in Jersey City. That proposition was, after considerable consideration and discussion, both at that (the meeting at which it was made) and at subsequent meetings of the trustees, accepted, with the clear understanding that there were $7,400 due on the Brown mortgage, and that Barrows would get Brown, trustee, to take the mortgages which he then held as collateral, absolutely from Barrows, on behalf of the bank, and that Barrows should pay Brown $1,400 of the money which he, Barrows, should receive from the bank, for the bank." This agreement was executed on the 11th of February, 1876. Barrows, on that day, received from the secretary of the bank the bank's two checks, one for $1,400 and the other for $6,000. The secretary met Brown

and Barrows together, received the assignment of the bond and mortgage from Brown to the bank, and thereupon delivered to Barrows the check for $1,400, which he at once endorsed to Brown, trustee. The secretary then handed the $6,000 check to Barrows, who then endorsed and delivered it back to him. The secretary afterwards drew the money, and paid it out, according to the agreement, for and on account of Barrows.

In this transaction the bank officers wholly ignored the rights of Bill. They not only were apprised of them, but they knew that he asserted them. The secretary says that Barrows told the trustees, before the agreement was executed, that he had seen Bill, who had a second mortgage on one of the lots, and that he could arrange with him for the small balance which was due on his mortgage. He further says that some reply was made to this, and some one inquired as to what transaction Barrows had had with Bill; that Barrows said that Bill had lent him money from time to time; that he thinks Barrows said Bill held a mortgage against him for $4,000, on a Grand street house, and something about a Staten Island transaction; that Barrows said that Bill had threatened him with suit or arrest if he should have Brown assign the mortgage to the bank; that Barrows said he could arrange it with Bill, and that Bill held some securities for him, and their arrangements were such that he could either assign the Dixon mortgage on the Clerk street house, or fix it up in some other way. He says they all talked and discussed the whole question; that he does not remember the words of any other conversation, but they "had it, *pro* and *con*," for three or four hours; that Barrows was to see Bill and arrange the matter; that he subsequently reported that he had done so, so far as Bill was concerned; that the offer of Barrows's settlement with the bank, and the offer to assign the Brown mortgage to the bank, were not contingent upon Bill's accepting the arrangement with Barrows; that Barrows first mentioned Bill's name, and that Barrows said that Bill had "suggested

his, Barrows's arrest—to arrest him for obtaining money from him on false pretences." He adds that Barrows said that he had represented to Bill that the mortgage he had assigned to Bill was a first mortgage, although he admitted to them that it was a second or third mortgage; that Barrows said he would have Brown assign that mortgage, and he could arrange with Bill so that it would be all right. The bank officers, also, it may be added, caused a search of the records to be made before executing the agreement. By this, too, they were apprised of the existence of Bill's mortgage. It is clear, from the evidence, that they not only knew of Bill's rights, but relied on Barrows's undertaking to protect the bank against them.

The transaction between the bank, Barrows and Brown was not the purchase of the Brown mortgage by the bank from Brown, but was, in fact, the loan by the bank of $7,400 to Barrows upon that mortgage, after he had paid it off in the hands of Brown. For the mortgage Barrows gave to Brown his bond for $6,500, and agreed that the latter should hold the Redman and Mabin mortgage and the Sutton mortgage, together amounting to $6,500, as security therefor; and out of the money received by Barrows from the bank as consideration for the assignment of the Brown mortgage, he paid to Brown $1,400, $900 of which were applied in payment of his note of that amount, held by Brown, and the balance, $500, was endorsed as a payment on the bond of $6,500. The $7,400 paid by the bank was paid in checks to the order of Barrows, and the money was all disbursed for him, and on his account, at his request, and for his benefit. A small balance of about $300 was paid over to him. Of the $7,400, the sum of $2,712.19 was paid to the bank itself, on the claim against Barrows, to obtain payment whereof was the object of the advance by it to him. By the new bond and the collateral mortgages, the Brown mortgage was satisfied *pro tanto* as against the holder of a subsequent encumbrance on the property. *Bolles* v. *Wade*, 3 *Gr. Ch.* 458. But to the extent ($900) to

which the money advanced by the bank was employed in satisfaction of the mortgage debt due Brown, after applying the collaterals, the mortgage retained vitality and its priority over such subsequent encumbrance. *Hoy* v. *Bramhall*, 4 *C. E. Gr.* 563. The bank, when it took the assignment, knew of the equity of the subsequent encumbrancer, which was, as between him and Brown, to require the latter to reduce to the satisfaction of his debt the collateral securities in his hands. Those securities were of the value of $6,500. This would have left but $900 encumbrance on the mortgaged premises, prior to Bill's mortgage. Brown does not appear to have had notice of Bill's equity, but the bank had, and, under the circumstances, it can have no better position than Brown himself would have had with like notice. If he had had notice of Bill's equity, he would not have been permitted to defeat it. He had two funds for the satisfaction of his debt, and Bill only one. He would not have been permitted to defeat Bill's equity by electing to satisfy his debt out of the latter fund, and relinquishing to Barrows the former. The bank, as before remarked, had full knowledge of the equity, and with that knowledge it became a party to an arrangement by which Brown, though he had recourse to the collaterals for the satisfaction *pro tanto* of his mortgage debt, at the same time assigned the mortgage to the bank, to be held as a still subsisting encumbrance on the mortgaged premises; thus enabling Barrows to make the collateral mortgages available to himself, and defeat Bill's equity. A paramount creditor who, having two funds, only one of which is common to him and a junior creditor, takes, with knowledge of the rights of the latter, that which is his only resort, will be required in equity to cede so much of the other fund as will compensate for the injury. The bank is not entitled to the protection accorded to a purchaser for value without notice, for not only had it notice, but it undeniably advanced the money to Barrows, on the security of the assignment of the Brown mortgage, in order, and merely in order, thus to obtain payment of the

debt of $2,712.19 before referred to, relying upon Barrows to satisfy Bill. Under such circumstances it is entitled to no protection, except as to the $900. *Herbert* v. *Mechanics Association*, 2 *C. E. Gr.* 497. The complainant's mortgage is entitled to priority over Bill's, to the amount of $900, and no more, of principal, with the interest thereon. To pay that money, that part of the mortgaged premises which is not covered by Bill's mortgage, must be first sold.